COWBOY STATE BANK & TRUST CO. v. GUINN et al. (No. 745.)

(Court of Civil Appeals of Texas. Amarillo. March 13, 1915. Rehearing Denied April 10, 1915.)

1. BANKS AND BANKING &#8658;112 — ACTS OF PRESIDENT—LIABILITY OF BANK.
   Where a bank president, in selling its stock, was acting as agent of the institution, the bank was liable for his fraudulent representations.
   [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 271, 272; Dec. Dig. &#8658;112.]

2. BANKS AND BANKING &#8658;118—REPRESENTATION BY OFFICER — EVIDENCE — SUFFICIENCY.
   In a suit on a note given in payment for bank stock, evidence held to support a verdict that the bank president, who made fraudulent representations, was acting as the bank's agent.
   [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1726–1738; Dec. Dig. &#8658;118.]

Appeal from District Court, Fisher County; John B. Thomas, Judge.

Action by the Cowboy State Bank & Trust Company against J. O. Guinn and others. From a judgment for defendants, plaintiff appeals. Affirmed.

Jno. W. Woods, of Rotan, Harry Tom King, of Galveston, and Theodore Mack, of Ft. Worth, for appellant. Higgins & Hamilton, of Snyder, and L. H. McCrea, of Roby, for appellees.

HUFF, C. J. This is the second time this case appears in this court by appeal (160 S. W. 1103). Originally appellant bank instituted a suit against appellees, J. O. and J.

A. Guinn, on a note for $2,693.90, dated December 17, 1911, and due March 17, 1912, with interest from maturity at the rate of 10 per cent. per annum, and 10 per cent. attorneys' fees, payable to the order of the bank. The Guinns pleaded fraud and failure of consideration, and that the bank stock for which the note was given was in fact owned by the bank and was in the name of Arlon B. Davis, its then president, for sale, and further alleging that the original note, of which the note sued on is a renewal, was for $2,352, setting out the renewals. The admission of appellant in its brief will be sufficient without further setting out the appellees' answer, as follows:

"In other words, a case of fraud, so far as the sale of the capital stock by Davis to the plaintiffs is concerned, was made out in the pleadings."

Appellant answered by supplemental petition, that it acquired the note in the regular course of business for a valuable consideration, without notice of any of the alleged misrepresentations, inducing the execution of the note; that the sale of the stock and taking of the note therefor was a personal transaction of Davis with the appellees, and not by him as president of the appellant bank, and that he was without authority in any event as president to make the representations relied upon; that at the time of the alleged sale the entire stock of the bank had been sold, and that it was not the owner of any of its capital stock and had none for sale. The case was submitted to a jury, who returned special findings, upon which the trial court rendered judgment for the appellees.

The appellant makes the following commendable statement:

"In view of the findings of the jury, to the effect that Arlon B. Davis made to J. O. Guinn the representations alleged in the answer with regard to the value of the stock in the Cowboy State Bank & Trust Company, and that these representations were false and were material inducements to the defendants, J. O. Guinn and J. A. Guinn, in signing the note sued on in this cause, being answered in the affirmative, and in view of the further fact that the jury, in answer to special issue No. 5, found that J. O. Guinn and J. A. Guinn relied upon the representations made by Arlon B. Davis, we shall omit from this statement any reference to these matters, and shall assume, as we are bound to do, that the representations made by Arlon B. Davis to the appellees were false and were material, and acted upon by appellees to their prejudice."

The brief of appellant is to be commended, also, in omitting the assignments with reference to the charge and the refusal to give special charges because no bill of exceptions was taken, as required by law, and for that reason could not properly be considered, and it therefore presents but one assignment, to wit:

"Because the verdict of the jury and the judgment of the court is contrary to the law and the evidence, and is not supported by the evidence, in this: There is no evidence in this record to warrant the jury in finding that the bank stock in controversy was the stock of the Cowboy State Bank & Trust Company, or that Arlon B. Davis, in the transaction with the defendants, was acting for the bank and as the bank's agent."

[1, 2] The court submitted to the jury special issue No. 1:

"(a) Was the transaction between Arlon B. Davis and J. O. and J. A. Guinn an individual transaction on the part of Arlon B. Davis, whereby in consideration of the note sued on in this case he was selling to the defendants Guinn 20 shares of his stock in the Cowboy State Bank & Trust Company; or (b) was said transaction a transaction had by Davis as agent or representative of the bank for the bank in the sale of stock belonging to the bank?"

The jury answered question No. 1, "As agent for the bank." The parties on the trial entered into the following agreement, which is copied into the record:

"It is agreed by and between the parties to this suit that at the time of the Guinn transaction in controversy, Arlon B. Davis was president of the Cowboy State Bank & Trust Company, and that W. L. Foy was the cashier of the Cowboy State Bank & Trust Company, and both were acting as such at the time, and that they and each of them were familiar with the entire transaction in controversy."

J. O. Guinn testified to the representations as set out by him and as having been made by Davis. This witness testified, further, that Davis, in the first conversation he had with him, said that it would be against the banking laws of the state for the bank to loan its own money to buy its own stock, and that if he closed the deal he would have to arrange the details of the transaction so as to make it conform to the banking laws of the state. If he did not, and the state banking inspector—

"got hold of it, that he would raise cane with him and would make it hard for him [Davis] if he [the inspector] caught it, but that he [Davis] would have to arrange the details of it so that it would conform to the banking laws of the state so as to avoid the banking laws."

Davis told the witness, so he testified, that the moment he signed the note he would become a stockholder in the bank, and that his name would be entered on the register and kept in the vaults and, further, there was no such thing as bank stock. He testified he (witness) was ignorant in such matters, and accepted Davis' statement as true. He testified that after getting uneasy about the matter he went to the bank and inquired of the cashier, Mr. Foy, to ascertain if he was a stockholder. He then said to him, "Mr. Guinn I am a friend to you boys, and you have not been treated right"; that he did not examine at that time the books. Afterwards Foy said, in order to satisfy his mind, he would show him that he was not a stockholder, and would show him the register, and upon examining the register he found his name was not on the register, and that when he found out he was not a stockholder, he refused to further renew his note; that Foy told him if he would renew the note and secure it with a deed of trust on land he

would try to get his stock for him; that Dr. Callan, who succeeded Davis in the presidency of the bank, when Guinn called upon him for the stock, told him to be easy for two or three weeks, and he thought he could get the stock; that he was trying to get Davis down there to straighten up his crooked business; that he afterwards called upon the bank with his attorney and demanded to see the books, and was again told he was not a stockholder. On cross-examination witness testified Davis, in offering the stock for sale—

"said he wanted to place it with me, but the stock belonged to the bank, was the way I understood it. As to whether he told me in so many words that the stock belonged to the bank, will say that is the way I took it, for he says, 'Now, Dick, the bank can't loan money to buy its own stock because it is against the banking laws of the state, and I will have to arrange so the stock can be kept in my name so as to avoid the banking laws.'"

Davis gave Guinn the following letter at the time the original note was signed and delivered:

"Rotan, Texas, August 25, 1910.

"J. O. Guinn, Camp Springs, Texas—Dear Sir: This is to certify that I have sold you twenty shares of my stock in the Cowboy State Bank & Trust Company, transferable to you or your order upon the payment of your note of August 17, $2352.00, to said bank and maturing Feb. 17, 1911, or a renewal or substitution thereof.

"Yours very truly, Arlon B. Davis.

"Witness:
"W. L. Foy.
"J. A. Guinn."

The original note and the renewals thereof were payable to the order of the Cowboy State Bank & Trust Company. The facts show that when the note was signed by J. O. and J. A. Guinn, that Foy, who witnessed the above, was cashier of the bank, and was within a few feet of the negotiations, and heard, if not all of them, at least a part. When the note was signed Davis handed it to Foy as cashier of the bank and directed him to credit his, Davis', account, with $2,-000, the bank taking the discount. It is shown this amount was subject to the check of Davis. This amount the bank applied to indebtedness due the bank by Davis.

Dr. Callan, who succeeded Davis as president of the bank, in February, 1912, testified that Guinn demanded the stock from him, and that he told Guinn the bank had no stock to issue; that his understanding was that Davis had some stock as collateral to some indebtedness of his in the bank. He also testified to buying stock in the bank on two occasions. In each instance he bought the stock through Davis. The first was the stock of Mr. Leonard; the last stock which was issued upon the increase of the capital stock he bought direct of the bank through Davis. He gave his note for this stock which he testified took him nearly two years to pay. He did not think the last stock he bought was attached to his note as collateral.

Foy, the cashier, testified: That he was present during the transaction. At that time Davis had $9,000 or $10,000 stock in the bank. That he told Foy in the presence of the Guinns that he had sold them, or one of them, $2,000 worth of his stock, and that he would hold it as collateral to secure Guinn's note. That the Guinns renewed their note three times, and Davis, while president handled the renewals. After Callan became president they were called upon for another renewal, with real estate security. Guinn demanded his stock, and Foy assured him if he renewed the note with the security he would get his stock. He further states that he had not, at any time, refused to deliver the stock if the appellees would renew and secure the note, that was the very thing he was trying to do, renew the note and deliver the stock, and that he was in a position at all times to deliver them the stock. He says Davis had certificates of stock of some $4,000 or $5,000 in his, Davis', private papers, in the bank, and that he had authority from Davis when the note was paid to issue it to appellees, and it was in the vaults for that purpose, subject to his, Foy's, control. This witness also shows that most of the stock he purchased in the bank he bought from Davis or from a Mr. Bailey, a kinsman of Davis and the former cashier of the bank. He borrowed money from the bank and gave his note for the money and took the money and bought this stock. He testified the bank did not hold the stock for the Guinn boys, but that he personally held it as an individual for Davis and did not hold the stock for the bank or as collateral security on the note, but was holding it until the note was paid; that the Guinn boys at all times were capable of paying their note. The reason he did not deliver the stock was appellees did not pay the money on the note. "When they paid me the money on the note, then I was willing to deliver to them their stock and never until then—that is right. Yes, sir; whenever they paid that note, I could have delivered to the Guinns their stock. The note represented all that the bank held against the Guinns, and the stock represented what the agreement was between Davis and the Guinns. As to whether, then, the cash represented the payment for the stock and not payment for the note also, if they had tendered the cash it would have represented the payment for the note, and if they had produced the cash, I would have given them their note. Yes; we would also have delivered them their stock, but we would not have delivered them their stock unless they had paid cash in full on that note." He further testified that he had an agreement with Davis that he would take the note and give Davis credit if Davis would hold the stock to secure the bank. Davis never indorsed the original or the renewal notes. The evidence does not show that he was held by the bank

as being liable on the note to the bank by appellees.

Davis' testimony shows that the bank increased its capital stock in 1909, $25,000; that of this stock he took $8,000, W. R. Bogart, $7,000, and A. R. Bogart, $5,000, and the other $5,000 was sold to other and various parties; that to pay for his $8,000 he borrowed money from the Union National Bank, $8,000. He testified that the minute books of the bank on May 27, 1910, show that the directors allowed him credit for $8,000, and he used this money to pay the loan he had obtained to pay for the stock purchased. When the new stock was issued he was indebted to the bank for $5,000. This sum was money he got from the bank to pay other banks for money borrowed to pay for the stock in the original corporation. This witness' testimony shows that at the directors' meeting approving the note of appellees, there were present Foy, W. R. Bogart, N. Harrison, and Arlon B. Davis. The evidence, as shown by the minute books, is that these directors were each heavy borrowers from the bank. After the issuance of the new stock, Harrison was owing $6,500; A. R. and W. R. Bogart were indebted for their firm, $10,083.88. Davis testified that he, then at the trial, owned $4,000 of the stock, which had been up as collateral to a note given by Harrison to the bank, which he (Davis) afterwards purchased. It is shown by all the evidence that the appellees were regarded as solvent, and their notes signed by them individually, good by the officers of the bank. The testimony of the appellant's witnesses is that the stock for which appellees gave the note belonged to Arlon B. Davis and did not belong to the bank at the time of the transaction between Davis and appellees. We believe there are facts sufficient to authorize the finding of the jury that the stock belonged to the bank when sold to appellees by Davis, and that in its sale Davis was the agent of the bank. This being true, the fraudulent representations, made by Davis, as the agent of the bank, rendered the bank liable therefor. Cowboy State Bank v. Guinn, 160 S. W. 1103; Bank v. Cruger, 91 Tex. 446, 44 S. W. 278.

If Guinn's evidence is to be believed, he and Davis, when the stock was purchased, regarded it as the property of the bank, and that the bank could not loan its money to purchase its own stock, and it was arranged to be kept in the name of Davis. This record strongly suggests that such shifting and scheming had been resorted to by some of the directors, if not all of them, and other stockholders. The method of buying this stock, as shown from the testimony of the cashier and the then president, to say the least of it, was an unusual one. Davis claimed to have been selling the stock as his own, yet took a note payable to the bank.

He did not indorse the note or in any way become liable to the bank for its payment but nevertheless retained the stock until the money was received on the note, and at the same time the note was regarded as gilt edge. The cashier says the stock was in his possession, to be held until the note was paid, but yet says it was not held as collateral. He says he was holding it for Davis, and yet Davis had received the cash on this note, and thereby received full consideration for the stock. What interest could Davis have in retaining this stock when he had been paid for it and was in no way responsible for the payment of the note? If sold the stock was not his. If Guinn got the money and paid for it, the stock was his. If it was not the bank's property, or held by the bank to secure the note, why should the cashier refuse to deliver it? The explanation readily suggested is that it was the bank's property, and nothing was given for it but a note which was in clear violation of the law. It is certainly suggested by the record that in order to increase the capital stock the directors borrowed the money to pay for stock subscriptions, and after the charter was obtained the directors gave to Davis a right to borrow just the amount of his stock subscription, which amount he did borrow, and by that amount paid off the loan which he had obtained to comply with the law requiring the capital stock to be fully paid in. This stock, or at least a part of it, was held, the cashier says, in the bank. Davis would not deliver it when he sold it and got the cash; the bank would not deliver it until the note was paid, which its officers pronounced good, and which was not put up as collateral to the note. We think from the facts the jury was warranted in inferring that this stock was held in the name of Davis for the bank, and when he sold it he did so as the agent of the bank. If he did, then it was not only a failure of consideration, but the note was void. Gen. Bonding, etc., v. Mosely, 174 S. W. 1031, recently decided by this court, Judge Hall rendering the opinion. We believe this case should be affirmed; and it is accordingly so ordered.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes